UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY F. OPASIK,

    Plaintiff,

v.

SEDGWICK CLAIMS MANAGEMENT
SERVICES, INC., an Illinois corporation and
DETROIT DIESEL CORPORATION
DISABILITY BENEFIT PLAN, an employee
welfare benefit plan,

    Defendants.

_____/

Case No. 13-10207
Hon. Lawrence P. Zatkoff
Magistrate Judge Laurie J. Michelson

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on March 31, 2014

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I.  INTRODUCTION**

This matter is before the Court on the parties' cross Motions for Judgment on the Administrative Record [dkt 18, 19]. The parties have fully briefed the motions.[1] The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the motions be resolved on the briefs submitted. For the following reasons, Plaintiff's Motion is GRANTED and Defendant's Motion is DENIED.

---

[1] Although Sedgwick Claims Management Services, Inc. ("Sedgwick") was initially a party in the instant matter, the Court dismissed all claims against Sedgwick pursuant to a stipulated order received from all interested parties.

## II. BACKGROUND

### A. OVERVIEW OF THE PARTIES

This case centers upon a dispute over a claim for long-term disability ("LTD") benefits. Plaintiff Gary Opasik ("Plaintiff") was employed by Detroit Diesel Corporation ("Detroit Diesel") for nearly 27 years, and was a "Senior Engineering Technician" at the time he stopped working due to his medical condition. Among his essential duties, Plaintiff would build, rebuild, and overhaul truck engines with lifting sometimes reaching in excess of 100 pounds.

As an employee of Detroit Diesel, Plaintiff was a participant in an employee welfare benefit plan. The Detroit Diesel Corporation Disability Benefit Plan (the "Plan") is an ERISA-governed plan sponsored by Detroit Diesel that has as its sole and exclusive purpose to provide income replacement benefits to Detroit Diesel's disabled employees. Defendant is the Plan itself,[2] while Detroit Diesel is the administrator of the Plan. Consistent with the Plan terms Detroit Diesel delegated its administrative responsibilities to Sedgwick. Notably, the Plan contains language specifically granting its administrator discretionary authority in administering the terms of the Plan.

### B. ELIGIBILITY FOR BENEFITS UNDER THE LTD PLAN

To be eligible for LTD benefits under the Plan, Plaintiff was required to be disabled. The Plan defines "Disabled or Disability" for LTD purposes as:

> Due to sickness, pregnancy or accidental injury you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis.
>
> Your loss of earning must be a direct result of your sickness, pregnancy or accidental injury. Economic facts such as, but not limited to, recession, job

---

[2] The proper party to bring a claim against with regards to ERISA claims for benefits is the plan itself. *See State Farm Mut. Auto. Ins. Co. v. Wash. Group Inter., Inc.*, No. 06-13428 2007 WL 1192222, at *6 (E.D. Mich. April 19, 2007); *Smith v. Provident Bank*, 170 F.3d 609, 617 (6th Cir. 1999) ("ERISA gives plans the ability to sue and be sued in their own right."). As such, "Defendant" and "the Plan" are used interchangeably throughout this opinion.

obsolescence, pay cuts and job-sharing will not be considered in determining whether you meet the loss of earnings test.

The Plan further defines "Appropriate Care and Treatment" as:

**Appropriate Care and Treatment:** means medical care and treatment that meet all of the following:
  1. it is received from a Doctor whose medical training and clinical experience are suitable for treating your Disability;
  2. it is necessary to meet your basic health needs and is of demonstrable medical value;
  3. it is consistent in type, frequency and duration of treatment with relevant guidelines of national medical, research and health care coverage organizations and governmental agencies;
  4. it is consistent with the diagnosis of your condition; and
  5. its purpose is maximizing your medical improvement.

The Plan also requires participants to provide proof of their disability by giving the plan administrator such information as the date a participant's disability started, the cause, and the prognosis going forward. Further, the Plan requires participants to provide proof of continuing disability, and proof that a participant has applied for Social Security disability benefits.

## C. PLAINTIFF'S CLAIM FOR LTD BENEFITS

Plaintiff was approved for LTD benefits effective August 10, 2007. Defendant asserts this was due to a diagnosis of "Panic Disorder." Plaintiff contends he was found continuously and permanently disabled due to his atherosclerotic heart disease, ischemic heart disease, hypertensive heart disease, anxiety and dissociative disorders. The Social Security Administration found that Plaintiff has been totally disabled since August 8, 2006.

In December 2008, Defendant reports that Plaintiff underwent an independent medical examination in which Plaintiff was found able to return to work from a psychiatric standpoint,

but unable to work from an internal medicine standpoint.[3] Plaintiff continued to receive LTD benefits from August 7, 2007, through February 22, 2012. During that time, Plaintiff received treatment on a yearly basis from his family practice doctor, Dr. Anthony Munaco. Plaintiff also received treatment during this time period from Dr. Stephen Gunther, a cardiologist. Both doctors consistently found during the five-year period Plaintiff received benefits from Defendant that Plaintiff's medical condition did not change, and both consistently found Plaintiff to be completely and totally disabled.

**D. TERMINATION OF PLAINTIFF'S BENEFITS**

In September 2011, Defendant received an anonymous report[4] that Plaintiff was able to work but would drink energy drinks prior to his doctor appointments so as to increase his blood pressure. In response, on November 15, 2011, Defendant required that Plaintiff submit to an independent medical examination conducted by Dr. Gerald Levinson. In a 2011 deposition given by Dr. Levinson in an unrelated matter, Dr. Levinson testified that he is board certified in internal medicine and board eligible in "cardiovascular."[5] Dr. Levinson also testified that he conducts independent medical reviews, but that they comprise only 5% of his practice. Dr. Levinson did admit that he has testified as an expert in approximately 100 cases during his career, doing so for the defense "99.9%" of the time. Dr. Levinson provided a detailed medical report the next day, indicating that he reviewed the medical records from Dr. Munaco and

---

[3] Defendant does not cite to any report from any independent medical examination in coming to this conclusion; rather, Defendant refers the Court to notes contained within Defendant's file of Plaintiff's claim for disability benefits.

[4] Although Plaintiff's motion deals with this topic at length, the Court finds the initial action triggering Defendant's request that Plaintiff undergo another independent medical examination irrelevant. As such, the Court will not address this further.

[5] The Court notes that the distinction between "board certified" and "board eligible" is not insignificant. The American Board of Internal Medicine notes that "board eligible" means that a person has completed the training for initial certification but has not applied or passed the certifying examination in the relevant specialty. *See* AMERICAN BOARD OF INTERNAL MEDICINE, POLICIES AND PROCEDURES FOR CERTIFICATION 15 (December 2013), *available at* http://www.abim.org/pdf/publications/Policies-and-Procedures-Certification.pdf.

minimal medical records from Dr. Gunther. In this report, Dr. Levinson concluded that "[o]n a purely clinical basis, assuming that [Plaintiff] has much needed improvement in his medical therapy, specifically as it relates to his blood pressure," Plaintiff was able to return to work, so long as a 30 pound lifting restriction was in place. Dr. Levinson did state that his final opinion would be reserved pending review of more medical records from Plaintiff's cardiologist, Dr. Gunther.

After Plaintiff's independent medical examination with Dr. Levinson, Sedgwick requested updated medical information from Plaintiff's treating physicians. On January 16, 2012, Plaintiff was seen by Dr. Gunther. Dr. Gunther indicated he was unable "to provide [Plaintiff] medical information regarding his disability claims" due to Plaintiff missing three consecutive stress tests. Dr. Gunther's notes indicate Plaintiff cancelled his stress tests because of "anxiety and fear," but also notes that Plaintiff has been "normally active and in fact was able to deer hunt for a week, slogging through the wet, cold woods without angina chest discomfort."

On January 18, 2012, Dr. Levinson updated his November 2011 report based on Dr. Gunther's medical records. Dr. Levinson relied heavily on the fact that Plaintiff did not see Dr. Gunther for two and a half years, finding this, "totally noncompliant, both with his visits as well as his medications." Dr. Levinson also took special notice of Dr. Gunther's notes regarding Plaintiff's plan to go hunting, indicating that Plaintiff had already "managed to drag two bucks through the woods by hand during the archery season." Dr. Levinson concluded that,

> [b]ased on the fact that [Plaintiff] is able to go hunting, and in fact had a 'stress test' due to the fact that he was able to drag two bucks through the woods by hand during archery season, I am not going to change my initial report in that I feel that he could return to his usual and customary employment, obviously with attention to medication compliance and follow up with his physician, with the only restriction being that he not lift greater than 30 pounds.

5

On January 31, 2012, Dr. Gunther indicated that Plaintiff was medically disabled from his current employment. Dr. Gunther indicated this was the case due to the fact that Plaintiff's "anomalous coronary anatomy, particularly its passage between the aorta and pulmonary artery, puts him at risk for serious cardiac complications under periods of emotional stress with the accompanying hypertension and tachycardia. The duration of this disability is permanent." On February 16, 2012, Defendant extended Plaintiff's LTD benefits through February 21, 2012, based on Dr. Gunther's medical opinion.

On February 20, 2012, Detroit Diesel informed Sedgwick that Detroit Diesel was able to accommodate Plaintiff's work restrictions contained in Dr. Levinson's January 2012 report. Plaintiff's LTD benefits were then terminated by Sedgwick, effective February 22, 2012, and Defendant asserts Plaintiff was instructed to return to work starting on February 22, 2012. Plaintiff was informed of the termination of his benefits in a letter ("Denial Letter") dated March 7, 2012, which stated:

> This letter is to advise you that your benefits under the Extended Disability Benefits are being denied effective 2/22/2012 due to the results from the Independent Medical Opinion. The results indicated that you were able to return to work with restrictions. The location was able to accommodate the restrictions, therefore you were advised to return to work on 2/22/2012.

As Plaintiff indicates, the Denial Letter does not mention the Plan's definition of disability. Plaintiff asserts he attempted to return to work on February 23, 2012,[6] but was hospitalized due to chest pain. Plaintiff was fired that same day, according to records from Sedgwick, because he "did not report to work for a job within his restrictions."

### E. PLAINTIFF'S INTERNAL ERISA APPEAL AND DENIAL

On September 12, 2012, Plaintiff appealed the decision to terminate his LTD benefits.

---

[6] Defendant claims this date was February 22, 2012. The Court finds that the exact date, however, appears irrelevant to the issue at hand.

Plaintiff provided medical records, sworn testimony, an independent Functional Capacity Examination (FCE) from Dr. Todd Best, and findings from the Social Security Administration's disability assessment. The documents included records and sworn testimony from Dr. Munaco, in which Plaintiff alleges Dr. Munaco indicated Plaintiff was suffering from a sickness and was receiving appropriate care and treatment for that medical condition.  Dr. Munaco indicated in a sworn affidavit that Plaintiff's atherosclerotic heart disease, hypertension, and congenital heart defect—combined with Plaintiff's severe anxiety and depression—places Plaintiff at a very high risk of serious cardio complications, including "sudden death." Dr. Munaco found that Plaintiff was totally disabled from working on a full-time basis in his own occupation from February 22, 2012, onward.

Dr. Gunther's medical records were also provided.  Several times throughout these records, Dr. Gunther criticizes Plaintiff's poor lifestyle choices and his noncompliance with his medical treatment plan.  As previously indicated, Plaintiff also cancelled or missed three consecutive stress tests scheduled with Dr. Gunther.  Nonetheless, Dr. Gunther still found that Plaintiff's condition made him a high risk for future cardiovascular events.  Further, in a sworn affidavit, Dr. Gunther notes that while he is "admittedly critical of [Plaintiff's] health habits," the report done by Dr. Levinson "seems to confuse genuine concern over a patient's lifestyle choices with the ability to work when, in fact they are wholly distinct concepts."  Indeed, Dr. Gunther found that even if his health measures were "scrupulously followed by [Plaintiff], it would not change the fact that, owing to his documented genetic heart defect, sudden cardiac death could be triggered by the resumption of full or part-time work in an occupational setting."  Dr. Gunther provided in this affidavit that Plaintiff is totally disabled from working on a full-time basis in his own occupation from February 22, 2012, onward.

Plaintiff also submitted a FCE compiled by Dr. Todd Best. Dr. Best found that, based on Plaintiff's sickness, he was permanently disabled from gainful employment. Defendant argues that Dr. Best failed to review Plaintiff's medical records or the results of any medical testing, and that Plaintiff gave Dr. Best an inaccurate description of his hunting activities.

Plaintiff's appeal materials were forwarded to Dr. Michael Rater[7] and Dr. Navid Kazemi[8] for review, and both prepared reports. Dr. Rater found that, from a psychiatric perspective, Plaintiff was not disabled from the ability to perform any occupation from February 22, 2012, forward. Specifically, Dr. Rater found that, based upon Plaintiff's "lack of compliance with treatment, his capacity to actively pursue stressful hobbies and the secondary gain nature of his complaint, I find the medical record has no impact on his work capacity from a mental standpoint." Dr. Rater attempted to speak with Dr. Munaco, but was unable to reach him by telephone. Plaintiff indicates that Dr. Rater never examined, tested, interviewed, or otherwise interacted with Plaintiff.

Dr. Kazemi found that, "with the information provided, no clear documentation is present that can justify permanent disability, but it may reasonably become established with further investigation." Dr. Kazemi indicated he reviewed all of Plaintiff's medical information. Dr. Kazemi also attempted to speak with Dr. Gunther, but could not, as Dr. Kazemi was informed that Dr. Gunther did not have Plaintiff's consent to provide Dr. Kazemi with further information.

On December 4, 2012, Sedgwick denied Plaintiff's appeal. The letter denying Plaintiff's appeal ("Appeal Letter") listed the definition of disability in the Plan and stated the Plan's policy that benefits would end once Plaintiff was no longer disabled. The Appeal Letter then detailed the reports created by Dr. Rater and Dr. Kazemi. The Appeal Letter states that, "[b]ased on the

---

[7] Dr. Rater is board certified in Psychiatry.
[8] Dr. Kazemi has a "diplomate" from the American Board of Cardiovascular Disease. The Court will consider this as a functional equivalent to being board certified in cardiology.

8

information provided, it has been determined that [Plaintiff] has not met the eligibility requirement according to the Plan provisions." Defendant claims the denial was the result of having no clinical findings to support that Plaintiff was disabled. Plaintiff asserts the denial does not state how Plaintiff failed to meet the contractual definition of disability.

### III. LEGAL STANDARD

"When reviewing an ERISA administrative decision, our review is limited to the evidence that the plan administrator examined in making his or her determination." *Ziegler v. HRB Mgmt.*, 182 F. App'x 405, 406 (6th Cir. 2006) (citing *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 441 (6th Cir. 2005)). Therefore, "the district court should conduct a . . . review based solely upon the administrative record." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618 (6th Cir.1998).

The standard of review on a denial of benefits decision in an ERISA case depends largely on whether "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "When such authority is granted, the highly deferential arbitrary and capricious standard of review is appropriate." *Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998) (internal quotations and citations omitted). If the plan vests no discretionary authority in the administrator, then the decision should be reviewed by the court *de novo*. *Bruch*, 489 U.S. at 102.

Although the arbitrary and capricious standard is deferential, "it is not a rubber stamp for the administrator's determination." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006). The standard "requires that the decision 'be upheld if it is the result of a deliberate, principled reasoning process, and if it is supported by substantial evidence.'" *Mitchell v. Dialysis*

*Clinic, Inc.*, 18 Fed. App'x. 349, 353 (6th Cir. 2001) (citing *Killian v. Healthsource Provident Admin., Inc.*, 152 F.3d 514, 520 (6th Cir.1998)). Such review also requires an analysis of the "quality and quantity of the medical evidence and the opinions on both sides of the issue." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)

## IV. ANALYSIS

Neither party disputes that the Plan in question gives Sedgwick—as plan administrator—discretionary authority to interpret the terms of the Plan. As such, the Court will determine whether the decision to terminate Plaintiff's benefits was arbitrary and capricious.

Plaintiff asserts his LTD benefits were improperly terminated. Specifically, Plaintiff argues the contractual definition for "disability" as contained in the Plan was never applied before terminating Plaintiff's benefits, and thus seeks recovery of his LTD benefits under 29 U.S.C. § 1132(a)(1)(B). Plaintiff also alleges that he was not given a full and fair review in violation of 29 U.S.C. § 1133, as the decision to terminate his LTD benefits was not based on "substantial evidence." Plaintiff seeks an award of all past due LTD benefits from the termination date, reinstatement in Defendant's plan, and reasonable costs and attorney's fees.

Defendant contends the decision to terminate Plaintiff's benefits was neither arbitrary nor capricious. Defendant asserts it was properly determined that Plaintiff was not disabled from working, and argues that Plaintiff cannot point to any evidence in the administrative record that indicates such a decision was arbitrary or capricious. Defendant further argues that Plaintiff was provided a full and fair review as established under 29 U.S.C. § 1133, as Plaintiff's Denial Letter gave a clear reason for such termination. Defendant also provided Plaintiff with an adequate appeals process, did not engage any biased examiners, and did not selectively review the record. Rather, Defendant asserts every document was considered during the review process, and that

Plaintiff was provided a fair and full review that cannot be considered arbitrary and capricious. Finally, Defendant argues that if the Court does find error in Defendant's termination of Plaintiff's benefits, the proper remedy should be remand to Sedgwick, the plan administrator.

### I. COUNT ONE: FAILURE TO APPLY THE CORRECT "DISABILITY" DEFINITION

Plaintiff asserts that Defendant never applied the correct definition of "disability" as contained in the Plan before terminating Plaintiff's LTD benefits. Specifically, Plaintiff asserts that neither his Denial Letter, nor his Appeal Letter, state how Plaintiff's medical conditions failed to meet the Plan's definition of "disability." Defendant argues that, while the Denial Letter does not mirror the language in the Plan, it nonetheless encompasses the Plan's requirement that Plaintiff must suffer a loss of earning as a direct result of sickness. As Plaintiff was deemed able to return to work, Defendant argues Plaintiff was not "disabled" as described in the Plan. Further, Defendant contends the denial of Plaintiff's appeal expressly quoted the Plan's definition of disability; thus, any argument that Sedgwick "never bothered to actually read the terms of the contract" is simply mistaken.

Under the arbitrary and capricious standard of review, a Court will uphold a plan administrator's determination regarding benefits if it is "rational in light of the plan's provisions." *Univ. Hospitals of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000) (quoting *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996)). The Court acknowledges that this standard does not mandate that a plan administrator must delineate in explicit terms the ways in which an individual failed to meet a plan's eligibility provisions before terminating benefits. The Court finds, however, that such language—or the lack thereof—does provide insight into whether a plan administrator's decision was rational in light of the plan's provisions.

Although Plaintiff presents his arguments that Defendant failed to properly demonstrate utilizing the Plan requirements in terminating Plaintiff's benefits in an independent claim, the Court finds that failure to properly demonstrate utilizing the Plan provisions in terminating Plaintiff's benefits—while not required—is one of many factors to consider. As such, a determination by the Court that communications provided by Defendant to Plaintiff failed to explicitly couple Plaintiff's termination of LTD benefits with the provisions of the Plan does not automatically mean that the termination of Plaintiff's LTD benefits was arbitrary and capricious.

While Defendant's current explanation does plausibly apply the Plan's definition of "disability" to Plaintiff's termination of benefits, such explanation was not made available to Plaintiff after either the initial termination of LTD benefits or after Plaintiff's appeal was denied. Indeed, the Denial Letter provided by Sedgwick contained two sentences denying Plaintiff's benefits, stating:

> This letter is to advise you that your benefits under the Extended Disability Benefits are being denied effective 2/22/2012 due to the results from the Independent Medical Opinion. The results indicated that you were able to return to work with restrictions.

The Denial Letter contains no reference to the Plan's definition of "disability": nothing in the letter indicates Plaintiff no longer suffers from a sickness or is not receiving "Appropriate Care and Treatment from a Doctor on a continuing basis." Likewise, the Independent Medical Opinion referenced in the Denial Letter makes no mention of Plaintiff no longer receiving appropriate medical care or no longer suffering from a sickness. Although the Appeal Letter does state "it has been determined that [Plaintiff] has not met the eligibility requirement according to the Plan provisions," the two-page Appeal Letter contains no evidence that the eligibility requirements were actually applied to Plaintiff's case.

Instead, Defendant now provides Plaintiff with a plausible, after-the-fact explanation in

12

litigation as to how both the initial termination and subsequent denial of Plaintiff's appeal fit within the requirements of the Plan. The Court finds that such after-the-fact "brainstorming" asks this Court to stray from the actual administrative record in an impermissible way. The Sixth Circuit addressed this very issue, stating:

> More importantly, it strikes us as problematic to, on one hand, recognize an administrator's discretion to interpret a plan by applying a deferential "arbitrary and capricious" standard of review, yet, on the other hand, allow the administrator to "shore up" a decision after-the-fact by testifying as to the "true" basis for the decision after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments that can survive deferential review. . . . To depart from the administrative record in this fashion would, in our view, invite more terse and conclusory decisions from plan administrators, leaving room for them— or, worse yet, federal judges—to brainstorm and invent various proposed "rational bases" when their decisions are challenged in ensuing litigation.

*Univ. Hospitals of Cleveland*, 202 F.3d at 852 n. 7. The Court therefore finds such "post hoc arguments" rationalizing how Plaintiff's LTD benefits were plausibly terminated within the bounds of the Plan's requirements as less than persuasive. Instead, the Court finds a thorough analysis of this factor gives weight to Plaintiff's argument that the termination decision was arbitrary and capricious.

## II. COUNT TWO: FAILURE TO PROVIDE A FULL AND FAIR REVIEW

Courts consider numerous factors in reviewing a plan administrator's decision to determine whether it was arbitrary and capricious, including the existence of a conflict of interest, the plan administrator's consideration of the Social Security Administration determination on disability and the quality and quantity of medical evidence and opinions. *See DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 444–445 (6th Cir. 2009). This Court will also review a plan administrator's reliance on non-medical evidence to deny benefits. *Id*.

A. Conflict of Interest

The Supreme Court and Sixth Circuit have illuminated several ways in which potential conflicts may affect benefit decisions. The Supreme Court has acknowledged that, while the treating physician rule does not apply in ERISA cases, "physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements.'" *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (internal citations omitted). The Supreme Court and Sixth Circuit also both found that a conflict of interest exists for ERISA purposes where the plan administrator both evaluates and pays benefits claims, even when the administrator is an insurance company and not the beneficiary's employer. *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008); *DeLisle*, 558 F.3d at 445.

In the instant matter, Defendant argues that only 5% of Dr. Levinson's practice—the doctor Defendant asked to conduct the independent medical review that found Plaintiff was not disabled—consists of independent medical reviews. As Plaintiff accurately points out, however, Dr. Levinson admitted that he has testified on behalf of insurance companies and others similarly situated to Defendant "99.9%" of the time. As established by the Supreme Court, the Court notes this is a potential conflict of interest. Further, the plan administrator in this case—Detroit Diesel—delegated its duties as plan administrator to Sedgwick. Thus Sedgwick, although not Plaintiff's employer, was acting as a plan administrator that both evaluated Plaintiff's claim and paid Plaintiff's benefits. Indeed, it was Sedgwick that terminated Plaintiff's benefits and denied Plaintiff's appeal. As such, the Court finds this evidence of further conflicts of interest important in determining whether the decision to terminate Plaintiff's LTD benefits was arbitrary and capricious.

B. Social Security Administration's Determination of Total Disability

The Sixth Circuit has addressed the degree to which a Social Security determination of total disability should affect a person's ability to receive benefits under an ERISA plan. While acknowledging that a plan's disability criteria may differ from that of the Social Security Administration's, the Sixth Circuit has established that:

> [i]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary and capricious.

*Delisle*, 558 F.3d at 446 (quoting *Bennett v. Kemper Nat'l Servs.*, 514 F.3d 547, 554 (6th Cir. 2008)).

Here, the Plan explicitly required Plaintiff to provide proof that he had applied for disability benefits through the Social Security Administration. Indeed, the Plan stated that failure to provide such proof within 60 days of the date it was requested could result in denial of his claim. Further, Defendant received a financial benefit from Plaintiff receiving Social Security benefits, as Sedgwick reduced the amount of LTD benefits Plaintiff received based on his monthly Social Security benefits. Finally, neither the Denial Letter nor the Appeal Letter mention Plaintiff's Social Security determination as a factor that was considered in Defendant reaching its own eligibility determination. Although Defendant's silence regarding Plaintiff's Social Security determination is not considered arbitrary and capricious in and of itself, taken together with the previously mentioned conflicting interests, these two factors provide a strong basis for concluding the plan administrator abused its discretion. *See Delisle*, 558 F.3d at 446 (citing *Glenn*, 554 U.S. at 118).

15

C. Quality and Quantity of Medical Evidence and Opinions

A review to determine whether a decision to terminate benefits under an ERISA plan was arbitrary and capricious necessitates a look at the quality and quantity of medical evidence available in the case. As established above, medical reports contained in the administrative record come from Plaintiff's treating family doctor (Dr. Munaco) and treating cardiologist (Dr. Gunther), along with reports from two independent medical examiners (Dr. Levinson and Dr. Best), and reports from two doctors that reviewed Plaintiff's records on appeal (Dr. Rater and Dr. Kazemi). A synopsis of all of these reports is given above.

Both Dr. Munaco and Dr. Gunther—Plaintiff's treating physicians during the five years he was covered by the Plan—consistently found that Plaintiff was disabled. Defendant draws the Court's attention to Dr. Gunther's assertion in a letter to Dr. Munaco that Dr. Gunther was "unable to provide [Plaintiff with] medical information regarding his disability claim." While Defendant asserts this illustrates a lack of medical evidence supporting Plaintiff's claim, the Court is not convinced. First, Dr. Gunther's report does not say there was no medical evidence to support a finding of disability; rather, it states that Plaintiff's failure to undergo a stress test meant Dr. Gunther was unable to provide any medical information regarding Plaintiff's claims at that time. Further, Dr. Gunther signed a letter on January 31, 2012—15 days after Dr. Gunther sent the letter to which Defendant refers—that unequivocally stated Plaintiff was totally disabled from working on a full-time basis. Finally, even if Defendant's current explanation of what Dr. Gunther's quote meant was accurate, no such description is provided in the Denial Letter or Appeal Letter Plaintiff received.

Indeed, the Denial Letter and Appeal Letter are completely devoid of any mention of this quote from Dr. Gunther. In fact, none of Dr. Gunther's records or opinions are mentioned

16

anywhere in either letter. No medical records are referenced from Plaintiff's other treating physician—Dr. Munaco—in either letter as well. In truth, the only medical records referenced in either letter are the reports of the physicians that found Plaintiff was not disabled. Although the Court notes that a plan administrator's decision to rely upon the medical opinion of one doctor over another cannot automatically be considered arbitrary and capricious, a plan administrator's decision to completely ignore both treating physicians' opinions may certainly be considered arbitrary. *See DeLisle*, 558 F.3d at 447 (citing *Glenn*, 461 F.3d at 671) ("Although [the plan administrator] does not owe special deference to the opinion of [a plaintiff's] treating physicians . . . it may not arbitrarily ignore them.").

This failure to address the medical opinions of numerous treating physicians provides substantial evidence to the Court that these opinions may not have been considered before terminating Plaintiff's LTD benefits. Additionally, as noted above, it is unclear whether Sedgwick or Sedgwick's file reviewers—Dr. Rater and Dr. Kazemi—knew of the Social Security determination of total disability. As such, the Court finds that the decision made, with regards to the available medical records, was not the result of a review that was a "deliberate, reasoned principled effort." This also weighs in favor of a finding that Plaintiff's LTD benefits were denied in an arbitrary and capricious fashion.

### D. Reliance on Non-Medical Evidence

The Court will also consider the reliance on non-medical evidence—Plaintiff's alleged hunting and fishing activities and Plaintiff's failure to strictly adhere to his medical programming—used to terminate Plaintiff's benefits. Defendant focuses a large portion of its arguments on such non-medical evidence. Indeed, Plaintiff adds ample emphasis—by repeating several times and bolding these words throughout its various filings—to the fact that Dr. Gunther

17

told Dr. Munaco in a letter that Plaintiff had not been to see Dr. Gunther in over 2 years and that Plaintiff was able to drag multiple deer through the woods.

First, Defendant gives no explanation as to why this non-medical evidence is relevant to determining whether Plaintiff is disabled as defined by the Plan. Second, Defendant cannot explain why it deemed only those portions of Dr. Gunther's reports relating to Plaintiff's cancellation of stress tests and deer hunting trips relevant, and yet chose to ignore Dr. Gunther's medical opinion that Plaintiff was completely and totally disabled. Indeed, Dr. Gunther specifically addressed these activities in a signed affidavit contained in the administrative record. Dr. Gunther said:

> 16. A patient can be both disabled and still be advised to be compliant with health treatments.
> 17. The specific references to hunting activities, poor diet, and avoiding stress tests are all evidence of non-compliance in [Plaintiff's] health regimen, made with the goal of increasing his longevity.
> 18. Even if these health measures were scrupulously followed by [Plaintiff], it would not change the fact that, owing to his documented genetic heart defect, sudden cardiac death could be triggered by the resumption of full or part-time work in an occupational setting at Detroit Diesel or anywhere else. . . .
> 20. Contrary to Dr. Levinson's opinion, these cautionary words are not to be confused as releasing [Plaintiff] for the resumption of competitive employment, nor are they to suggest that [Plaintiff] is not totally disabled from an occupational standpoint.

The Court finds that Defendant's reliance on non-medical evidence—contained in medical reports that Defendant otherwise completely rejected or failed to address—exhibits the sort of arbitrary and capricious decision-making this Court has the authority to overturn.

As is established above, the Court finds that the decision to terminate Plaintiff's LTD benefits was arbitrary and capricious and thus violated the requirements 29 U.S.C. § 1133. The clear potential for a conflict of interest, coupled with the complete failure to address the Social

Security Administration's findings of total disability and the substantial evidence provided in the administrative record to support a finding of total disability, demonstrate to the Court that Defendant arbitrarily and capriciously terminated Plaintiff's benefits.

### E. Relief

Plaintiff suggests that the proper remedy for a wrongful termination of benefits is to award all past due benefits from the date benefits were stopped. Defendant contends that remand to the plan administrator is the proper decision, as the only problem Plaintiff alleges is with the decision-making process, rather than claiming he was denied benefits to which he was clearly entitled.

The Court finds Defendant's argument not credible. As established by the Sixth Circuit:

> a plaintiff whose benefits have been terminated has, prior to the termination, a full expectation of continued disability payments until they are terminated by lawful procedures. Thus, "prior to the termination of her benefits by improper procedures, the status quo was that [the plaintiff] was receiving long-term disability benefits" and "the appropriate remedy is an order vacating the termination of her benefits and directing [the defendant] to reinstate retroactively the benefits."

*Wenner v. Sun Life Assur. Co. of Canada*, 482 F.3d 878, 884 (6th Cir. 2007) (internal citations omitted). Courts in this District have similarly applied this relief to cases where a plaintiff seeks—as does the Plaintiff here—relief under 29 U.S.C. § 1132 (a)(1)(B). *See Hanusik v. Hartford Life Ins. Co*, No. 06-11258 2008 WL 283714, at *7 (E.D. Mich. Jan. 31, 2008) ("The principal relief under [29 U.S.C. § 1132 (a)(1)(B)] is an order reinstating benefits and awarding retroactive benefits.")

### V. CONCLUSION

Accordingly, for the reasons set forth above, IT IS HEREBY ORDERED that Plaintiff's Motion for Judgment on the Administrative Record [dkt 18] is GRANTED and Defendant's

Motion for Judgment on the Administrative Record [dkt 19] is DENIED.

IT IS FURTHER ORDERED that Plaintiff's LTD benefits are immediately reinstated.

IT IS FURTHER ORDERED that Plaintiff is awarded retroactive reinstatement of his benefits, starting from the initial denial February 22, 2012, and onwards to the present date.

IT IS FURTHER ORDERED that Plaintiff is awarded all costs and attorney's fees requested. Eastern District of Michigan Local Rules 54.1 and 54.1.2 require that Plaintiff file these motions, along with supporting authority, after entry of judgment.

IT IS SO ORDERED.


Date: March 31, 2014                s/Lawrence P. Zatkoff
                                    Hon. Lawrence P. Zatkoff
                                    U.S. District Court